# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DARREN HEYMAN,

    Plaintiff

v.

STATE OF NEVADA EX REL. BOARD OF REGENTS OF THE NEVADA SYSTEM OF HIGHER EDUCATION ON BEHALF OF UNIVERSITY OF NEVADA, LAS VEGAS, et al.

    Defendants

Case No.: 2:15-cv-1228-APG-GWF

**Order (1) Granting Defendant Montgomery's Motion for Summary Judgment, (2) Granting in Part Collective Defendants' Motion for Summary Judgment, (3) Denying Plaintiff Heyman's Motion for Summary Judgment, and (4) Ordering Supplemental Motions for Summary Judgment**

[ECF Nos. 371, 374, 377]

Plaintiff Darren Heyman was a PhD student and graduate assistant at the University of Nevada Las Vegas's ("UNLV") College of Hotel Administration ("Hotel College"). Heyman alleges that the defendants created and spread a false rumor that he was going to cheat on his PhD qualifying exam ("Q-exam"), failed to properly investigate the rumor, erroneously removed him from his PhD program, and filed a specious bar complaint against him as retaliation for the current lawsuit. Heyman sues UNLV and the individual defendants, all of whom are or were affiliates of UNLV, for a variety of claims.

Pending are three motions for summary judgment filed by Heyman (ECF No. 377); defendant Rhonda Montgomery (ECF No. 371); and defendants UNLV, Donald Snyder, Stowe Shoemaker, Curtis Love, Sarah Tanford, Phillip Burns, Kristin Malek, Lisa Moll-Cain, Debra Pieruschka, and Elda Sidhu ("collective defendants") (ECF No. 374).

Heyman fails to provide sufficient evidence to survive summary judgment on most of his claims. I therefore deny Heyman's motion, I grant Montgomery's motion, and I grant the collective defendants' motion as to most of Heyman's claims.

## I.    BACKGROUND

In 2013, Heyman was a PhD student and graduate assistant at the UNLV Hotel College. During that time period, Donald Snyder was the Dean of the Hotel College and became the President of UNLV. Stowe Shoemaker was a professor at the Hotel College and replaced Snyder as the Dean. Curtis Love, Rhonda Montgomery, and Sarah Tanford were professors at the Hotel College, and Love was also the Director of Graduate Studies for the Hotel College. Phillip Burns was the Director of Student Conduct at UNLV. Kristin Malek and Lisa Moll-Cain were doctoral students and graduate assistants at the Hotel College. Debra Pieruschka was Assistant General Counsel at UNLV and Elda Sidhu was General Counsel. ECF Nos. 371 at 5-6; 374 at 2; 377 at 4.

Sometime after their first year in the PhD program, all doctoral students at the Hotel College are required to pass a Q-exam. Heyman alleges that in May 2013, just prior to his cohort's Q-exam, Shoemaker, Montgomery, Love, Tanford, Malek, and Moll-Cain published or republished a false rumor that Heyman was planning to cheat on the exam. Heyman also alleges that Snyder, Shoemaker, and Burns failed to adequately investigate the rumor and that various combinations of the defendants worked in concert to both have him separated from the PhD program and file a bar complaint against him as retribution for filing the current lawsuit. ECF No. 28. The defendants claim that no one accused Heyman of planning to cheat, that a proper investigation was conducted, that Heyman's separation from the program was the result of an administrative error and was corrected in a timely manner, and that the bar complaint was not part of a conspiracy or retaliation against Heyman. ECF Nos. 371 and 374.

Heyman filed his original Complaint and First Amended Complaint in state court. Because the case originally included a federal law claim, the defendants removed it to this court

on June 29, 2015. ECF No. 1. Heyman filed the operative complaint, his Second Amended Complaint,[1] on April 13, 2016. ECF No. 28. This complaint included 31 causes of action. On October 19, 2017, Judge Richard Boulware[2] dismissed 10 claims and defendant Neal Smatresk. The remaining causes of action are:

- 1) Defamation against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 2) Invasion of Privacy – False Light against UNLV, Montgomery, Love, Tanford, Malek, and Moll-Cain;

- 3) Civil Conspiracy against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 4) Concerts of action against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 5) Intentional Infliction of Emotional Distress against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 6) Breach of Contract against UNLV, Snyder, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 7) Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing against UNLV, Snyder, Shoemaker, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 8) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing against UNLV, Snyder, Shoemaker, Montgomery, Love, Tanford, and Burns;

- 9) Constructive Fraud against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 10) Deceit or Misrepresentation against UNLV, Snyder, Burns, and Shoemaker;

- 11) Detrimental Reliance against UNLV, Snyder, Shoemaker, and Burns;

- 12) Fraud in the Inducement against UNLV, Snyder, Shoemaker, and Burns;

- 13) Fraud and Intentional Misrepresentation against UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

- 16) Negligence against UNLV, Snyder, Shoemaker, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain;

---

[1] While this second amended complaint was incorrectly titled "First Amended Complaint," the parties agree that it should be referred to as the "Second Amended Complaint."

[2] Judge Boulware later recused himself from the case. ECF No. 406.

3

- 17) Negligent Hiring, Training, Supervision, and Retention against UNLV, Snyder, and Shoemaker;

- 26) Intentional Infliction of Emotional Distress against UNLV;

- 27) Negligence against UNLV;

- 28) Breach of Contract against UNLV;

- 29) Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing against UNLV;

- 30) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing against UNLV; and

- 31) Civil Conspiracy against UNLV, Pieruschka, Sidhu, Snyder, Shoemaker, Montgomery, Love, Tanford, and Burns. *Id.*

Claims 1-13 and 16-17 stem from the alleged rumor and failure to adequately investigate it, and Claims 26-31 stem from Heyman's separation from the PhD program and the bar complaint.

**II. EVIDENCE**

Much of the evidence Heyman relies on in his motion comes in the form of affidavits and deposition testimony, in which the deponent testifies about what someone else said. The defendants argue that nearly all this evidence is inadmissible hearsay. ECF Nos. 371 at 7-9; 374 at 3-4. Heyman responds that all of his evidence is admissible, either as non-hearsay or under one of the hearsay exceptions. ECF No. 389 at 28-29. He makes three arguments: (1) that because all of the declarants at each level of hearsay could testify at trial, the evidence will be in admissible form at trial so the statements can be considered at summary judgment; (2) that testimony regarding the accusation that he was planning to cheat is not hearsay because it is not offered to prove the truth of the matter asserted (i.e., that he intended to cheat) but to prove that the accusations were made; and (3) that any remaining statements either are "opposing party statements" that are excluded from hearsay or fall under one of the other hearsay exceptions. *Id.*

Evidence considered at summary judgment does not have to be in admissible form as long as the submitting party can reasonably argue that it would be "able to proffer [the] evidence

in admissible form at trial." *Romero v. Nevada Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016). If an objection to the evidence is made, the submitting party bears the burden "to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (explaining Fed. R. Civ. P. 56(c)(2)); *see also Sweet People Apparel, Inc. v. Phoenix Fibers, Inc.*, 748 F. App'x 123, 124 (9th Cir. 2019).

Heyman argues that because each individual at each level of hearsay might potentially testify at trial, all of his evidence should be considered in summary judgment. This explanation is insufficient, as it requires me to assume that each of the individuals involved in a hearsay declaration will testify at trial and that each will testify in a manner that supports the hearsay included in the proffered statement.

With regard to Heyman's second and third arguments, I must evaluate statements nested within statements at each level to determine whether the declaration at that level is hearsay and, if so, whether an exception applies at that level. Fed. R. Evid. 805. For example, when a deponent states that "[Moll-Cain] had said that [Malek] had told her that [Heyman was] planning on cheating on the exam" (ECF No. 378-4 at 84), at least two levels of hearsay must be evaluated for admissibility.[3] And the "matter asserted" by the each is different: the matter asserted Moll-Cain is that Malek made the declaration regarding Heyman, not that Heyman was planning to cheat. The deposition and each underlying statement may be inadmissible unless it falls under one of the hearsay exclusions or exceptions. Federal Rule of Evidence 801(d)(2) excludes from hearsay statements by party opponents:

---

[3] Here I assume either the deponent will testify at trial or the deposition testimony will be admitted under Rule 804(b)(1).

> A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and: (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Thus, statements made by the defendants and offered by Heyman fall within the opposing party statement exclusion and I will consider them unless there is a problem of hearsay within hearsay.

## III. ANALYSIS

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. 323. The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view the evidence and reasonable inference in the light most favorable to the nonmoving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

## A.    Heyman's Claims of Civil Conspiracy and Concert of Action (Claims 3, 4, and 31)

Heyman alleges that Montgomery, Love, Tanford, Malek, and Moll-Cain started the rumor that Heyman was going to cheat on the Q-exam, and obstructed or intentionally failed to

conduct a formal investigation into the rumor, all as part of a plan to have Heyman removed from the PhD program (Claims 3-4). ECF No. 28 at 37-38.  Although Burns is not named in the headings for those claims, he is prominently featured in the supporting text, so it appears that Heyman is also alleging that Burns participated in these actions.  Heyman also alleges that Snyder, Shoemaker, Montgomery, Love, Tanford, Burns, Pieruschka, and Sidhu acted in concert to separate Heyman from UNLV and submitted a bar complaint to prevent him from obtaining a law license (Claim 31). ECF No. 28 at 116-117.  Heyman sues UNLV for these claims under the theory that the defendants were UNLV's agents working within their scope of employment or as students.  The defendants argue that Heyman has failed to show any tortious action or agreement among the defendants related to the alleged incidents. ECF Nos. 371 at 20-23; 374 at 12.

"Actionable civil conspiracy arises where two or more persons undertake some concerted action with the intent to accomplish an unlawful objective for the purpose of harming another, and damage results." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 335 P.3d 190, 198 (Nev. 2014).  Actionable concerted action arises where two or more persons "agree to engage in an inherently dangerous activity, with a known risk of harm, that could lead to the commission of a tort.  Mere joint negligence, or an agreement to act jointly, does not suffice." *GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).  "To prevail in a civil conspiracy action, a plaintiff must prove an agreement between the tortfeasors, whether explicit or tacit.  Similarly, acting in concert with another tortfeasor requires an agreement." *Dow Chem. Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998), *overruled on other grounds by GES, Inc.*, 21 P.3d 11.  If the plaintiff presents no evidence of an agreement among the defendants, summary judgment in the defendants' favor is warranted. *See Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1998).

Heyman has not provided evidence of an agreement among any the defendants named in these claims aside from his own testimony that others had heard of such plans. *See, e.g.,* ECF No. 390-2 at 6-7 (where Heyman recalls non-party Wen Chang telling him she had heard from Malek that an unnamed group of faculty "were going to try and have [Heyman] kicked out of the program when [he] failed the Q-exam for the first time."). Even if such evidence was potentially admissible at trial (which appears doubtful), it is not sufficient to create a genuine issue of material fact regarding the existence of an agreement among some or all of the defendants in Heyman's civil conspiracy or concert of action claims. I therefore grant summary judgment to all defendants on Claims 3-4 and 31.

**B.    Heyman's Claims Stemming from the Rumor (Claims 1-2, 5-9, 13, and 16)**

Heyman alleges that Montgomery, Love, Tanford, Malek, and Moll-Cain published or republished a false declaration that Heyman was planning to cheat on his Q-exam. He claims these publications constitute defamation (Claim 1), invasion of privacy – false light (Claim 2), intentional infliction of emotional distress (Claim 5), breach of contract (Claim 6), breach of the implied covenant of good faith and fair dealing (Claim 7), tortious breach of the implied covenant of good faith and fair dealing (Claim 8), constructive fraud (Claim 9), fraud and intentional misrepresentation (Claim 13), and negligence (Claim 16).[4] Although neither his complaint nor his motion for summary judgment includes allegations that Burns created or

---

[4] It is not always clear from Heyman's complaint or the accompanying papers why each of the defendants is named in a given claim or which incidents are the basis for a given claim. For example, Claim 13 for fraud and intentional misrepresentation names UNLV, Montgomery, Love, Tanford, Burns, Malek, and Moll-Cain, but the supporting allegations do not mention Malek or Moll-Cain and only briefly reference Montgomery, Love, and Tanford. Similarly, it appears Heyman is suing some of the defendants named in Claim 6 for breach of contract due to spreading the rumor, while he is suing the rest for breach of contract due to their failure to adequately investigate the rumor.

spread the rumor, Heyman sues Burns for defamation (Claim 1). Heyman also accuses

Shoemaker of republishing the false declaration but sues Shoemaker only for negligence (Claim

16). Heyman sues UNLV for all of these claims under the theory that the defendants were

UNLV's agents working within their scope of employment or as students. ECF No. 28 at 33-37,

39-59, 65-67, and 74-82. The defendants contend they did not make statements regarding

Heyman's alleged plan to cheat on the Q-exam or they merely said that Heyman said it would be

easy to cheat on the exam, which they argue is not actionable. ECF Nos. 371; 374.

*1. Claims Against Shoemaker, Montgomery, Tanford, and Burns for the Rumor*

Heyman does not provide any admissible evidence that Shoemaker, Montgomery,

Tanford, or Burns published or republished a statement that Heyman was planning to cheat.

There is no evidence linking Shoemaker or Burns to the rumor. The only evidence linking

Montgomery and Tanford to the rumor is a statement in non-party Merrick McKeig's (a fellow

student) affidavit that non-party Toni Repetti (a UNLV professor) told him that she heard from

Montgomery and Tanford that Heyman was planning to cheat on the Q-exam. This statement is

hearsay within hearsay and is not admissible under any of the exclusions or exceptions. And

Repetti denies making such a statement. ECF No. 372 at 135. I therefore grant summary

judgment in favor of Montgomery and Tanford on Claims 1-2, 5-9, 13, and 16; Burns on Claim

1; to Shoemaker on Claim 16; and UNLV on those claims that are based on these defendants'

alleged conduct.

*2. Breach Claims Against Love, Malek, and Moll-Cain for the Rumor (Claims 6-8)*

Heyman concedes he has no contract with Love, Malek, or Moll-Cain. ECF No. 389 at

18. I therefore grant summary judgment in favor of Love, Malek, and Moll-Cain on Claims 6-8

and in favor of UNLV on those claims that were based on these defendants' alleged conduct.

*3. Remaining Claims Against Love for The Rumor (Claims 1-2, 5, 9, 13, and 16)*

To support his claims against Love, Heyman submits deposition testimony from non-parties Repetti,[5] Tony Henthorn,[6] and Jim Busser,[7] all of whom testify that they were told that Heyman was planning to cheat either directly by Love or through someone who said they heard the accusation from Love.

Repetti and Busser's testimony that Love made the statement is admissible under Rule 801(b)(2) because all three appear to be agents of the opposing party UNLV (and Love is a party opponent)statement rule. However, there is no genuine dispute that Love's statements were made in the context of his role as a professor tasked with ensuring that the exam was properly conducted. Thus, his statements fall under the intercorporate communication privilege. "A qualified or conditional privilege exists where a defamatory statement is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he as a right or duty, if it is made to a person with a corresponding interest or duty." *Circus Hotels, Inc. v. Witherspoon,* 657 P.2d 101, 105 (Nev. 1983) (citations omitted). Love was responsible for preventing cheating during the Q-exam, and he made statements to other professors that reflect a genuine effort to fulfill that responsibility. Heyman provides no evidence that Love abused this privilege or had an ulterior motive in making these statements. *Id.*

---

[5] "[Love] says to me something along the effects of, 'I have been told that [Heyman] is going to try to cheat on the Q exam, we need another proctor in the room.'" ECF No. 378 at 84.

[6] "[Love] came and told [Busser] . . . that [Heyman was] going to cheat. And so, [Busser] came and got me, and said look, 'We got to do something about this,' so he and I talked about it." ECF No. 378 at 206-207.

[7] "And [Love] described what he had been informed that [Heyman was] going to cheat and that he was very concerned about that, and had a number of suggestions for how to proceed. . . . He said that Kristin Malek had provided that information to him and some other faculty." ECF No. 378 at 324-325.

("Whether a particular communication is conditionally privileged by being published on a privileged occasion is a question of law for the court; the burden then shifts to the plaintiff to prove to the jury's satisfaction that the defendant abused the privilege by publishing the communication with malice in fact."). I therefore grant summary judgment in Love's favor on Claims 1-2, 5, 9, 13, and 16 and in UNLV's favor on to those claims that were based on Love's conduct.

### 4. Remaining Claims Against Malek for the Rumor (Claims 1-2, 5, 9, 13, and 16)

To support his allegations against Malek, Heyman submits an email to Heyman from Snyder[8] and an email between Snyder and Burns,[9] which state that the rumor was likely started by Malek. Heyman also relies on McKeig's affidavit[10] and Repetti[11] and Busser's deposition testimony,[12] in which each testifies they were told that Heyman was planning to cheat either directly by Malek or through someone who said they heard the accusation from Malek.

The defendants rely on Malek's interrogatory answers and deposition testimony, in which she denies stating that Heyman was planning to cheat on the Q-exam but admits telling Love and

---

[8] "The accusation that you had an intention to cheat on the qualifying exam was a student based rumor and clearly not the thinking or belief of the College or the University." ECF No. 378 at 4-5.

[9] "I understand that you have been involved to some extent with the matter involving a student's (presumably Kristin Malek's) accusation that another student, Darren Heyman, intended to cheat on his qualifying exams." ECF No. 390-11 at 2.

[10] "[Repetti] also told me that [Montgomery] and/or [Tanford] told her that they had been told that [Heyman] was planning to cheat on his qualifying exam by Kristen Malek." ECF No. 378 at 178.

[11] "[Moll-Cain] had said that [Malek] had told her that [Heyman was] planning on cheating on the exam." *Id.* at 95.

[12] "Q: Okay. In your opinion, who started the accusation? A: Kristin Malek. Q: You seem very certain of that. Why are you so comfortable saying that? A: Curtis Love directly told me that. I believe later even [Malek] acknowledged that that she had this conversation with you and that she did what she thought was right to bring it forward." *Id.* at 355.

Montgomery that Heyman told her "it would be easy to cheat on the Q-exam." ECF Nos. 375-1 at 179-180 and 213. The defendants also point to other witness testimony that supports Malek's version of events, including: Love's interrogatory answers [13] and deposition testimony,[14] Tanford's interrogatory answers [15] and deposition testimony,[16] and Burns' deposition.[17]

Viewing the evidence in the light most favorable to Heyman on the defendants' motion for summary judgment, there are issues of fact regarding whether and with what intention Malek started the rumor that Heyman was planning to cheat on the Q-exam. There are also issues of fact regarding Malek's alleged statements when viewing the evidence in the light most favorable to the defendants on Heyman's motion for summary judgment because Malek and others deny she said Heyman was going to cheat. Given that these alleged statements are the basis for Heyman's claims against Malek for defamation, invasion of privacy – false light, intentional

---

[13] "[Love] is not aware of any rumor or accusation that [Heyman] cheated, or planned to cheat, on the Q-exam. Rather, . . . Malek informed [Love] that [Heyman] had told her it would be easy to cheat . . . ." ECF No. 375-2 at 15-16.

[14] "What [Malek] told me was that [Heyman] had said that it would be very easy to cheat on the Q exam by using a thumb drive." Id. at 128. "Q: Did you hear that [Heyman] had been accused of planning to cheat on his Q exam? . . . [Love]: No. What I heard from [Malek] was that [Heyman] said it would be easy to cheat. . . Didn't say that he was going to; it was preemptive. It would be easy." Id. at 179-180.

[15] "[Tanford] is not aware of any rumor or accusation that [Heyman] cheated, or planned to cheat, on the Q-exam. Rather, . . . [Tanford] went to Dr. Curtis Love's office and learned about Kristin Malek's conversation with [Heyman] where [Heyman] told her that it would be easy to cheat on the Q-exam without detection. [Tanford] does not recall if she was in the office when Kristin Malek shared the information or whether she arrived afterwards while Dr. Love communicated the information . . . ." ECF No. 375-3 at 49-50.

[16] "Q: How would you define what Ms. Malek said? [Tanford]: It was a statement that she said you had made regarding that it would be easy to cheat on the exam . . . ." ECF No. 375-2 at 250.

[17] "[L]ooking at the information, there was never an accusation against [Heyman] of planning to cheat or to cheat." ECF No. 375-3 at 80-81.

infliction of emotional distress, negligence, constructive fraud, and intentional misrepresentation, I deny both parties' motions for summary judgment on Claims 1-2, 5, 9, 13, and 16 as to Malek.

### 5. Remaining Claims Against Moll-Cain for the Rumor (Claims 1-2, 5, 9, 13, and 16)

To support his claims against Moll-Cain, Heyman submits the email from Snyder, in which he states that "the accusation that you had an intention to cheat on the qualifying exam was a student based rumor,"[18] and Repetti's deposition testimony.[19]

None of this evidence sufficiently establishes that Moll-Cain published or re-published the rumor that Heyman was going to cheat. Snyder's email does not identify Moll-Cain as the source of the rumor but simply posits that it was a "student" who started it. Separate emails between Snyder and Burns suggest that the student that Snyder had in mind was Malek.[20] And while Heyman relies on Repetti's testimony as evidence that Moll-Cain helped spread the rumor, Repetti's statement actually referred to a conversation with Moll-Cain that took place years after the alleged incident for which Heyman is suing. Statements occurring this long after the initial alleged incidents were not covered in Heyman's second amended complaint, so the defendants were not given fair notice for claims arising from them. ECF No. 378 at 94-95. I therefore grant summary judgment in favor of Moll-Cain on Claims 1-2, 5, 9, 13, and 16 and in favor of UNLV on those claims that are based on Moll-Cain's conduct.

////

////

---

[18] ECF No. 378 at 4-5.

[19] "[Moll-Cain] had said that [Malek] had told her that [Heyman was] planning on cheating on the exam." ECF No. 378 at 95.

[20] "I understand that you have been involved to some extent with the matter involving a student's (presumably Kristin Malek's) accusation that another student, Darren Heyman, intended to cheat on his qualifying exams." ECF No. 390-11 at 2.

*6. Remaining Claims Against UNLV for the Rumor*

Heyman sues UNLV for Claims 1-2, 5-9, 13, and 16 under the theory that the defendants were UNLV's agents working within the scope of their employment or as students. Of the defendants Heyman names in those claims, only Malek remains. Neither party sufficiently addresses the issue of *respondeat superior* in regard to UNLV and Malek. Thus, there are remaining issues of fact regarding whether Malek's alleged statements were made as an agent or employee of UNLV. I therefore deny both parties' motions for summary judgment on Claims 1-2, 5, 9, 13, and 16 asserted against UNLV that arise from Malek's conduct.

**C.    Heyman's Claims Stemming from The Investigation**

Heyman alleges that Snyder, Shoemaker, and Burns failed to adequately investigate the source and veracity of the rumor that Heyman was planning to cheat on the Q-exam and subsequently failed to discipline the individuals who published or republished those allegations. Additionally, he alleges that Snyder knew that Shoemaker and Burns were not impartial investigators but allowed them to proceed in the investigation regardless, and that Burns misrepresented his relationship with Montgomery. Heyman claims that these failures and the subsequent promises made to him in regard to the investigation constitute breach of contract (Claim 6), breach of the implied covenant of good faith and fair dealing (Claim 7), tortious breach of the implied covenant of good faith and fair dealing (Claim 8), constructive fraud (Claim 9), deceit or misrepresentation (Claim 10), detrimental reliance (Claim 11), fraud in the inducement (Claim 12), intentional misrepresentation (Claim 13), and negligence (Claim 16).[21] Heyman sues

---

[21] Shoemaker is not included in Claim 6 for breach of contract and only included in Claim 16 for negligence related to the alleged republication of the rumor.

UNLV for all these claims under the theory that the defendants were UNLV's agents working within the scope of their employment or as students. ECF No. 28 at 41-82.

In support of his claims, Heyman submits (1) an email from Snyder stating his office will investigate the rumor;[22] (2) deposition testimony of Wen Chang (a fellow student), who is the only non-defendant Burns claims to have interviewed and who does not recall being asked any questions relating to Heyman or the accusations made against him;[23] (3) Burns' deposition testimony, in which he admits that there are no notes or a final report regarding the investigation[24] and that he did not begin interviewing the relevant persons until nearly three months after Heyman provided him with an account of the alleged incident, and (4) evidence that Burns had a working relationship with Montgomery, despite allegedly telling Heyman that they were merely familiar with each other.[25]

---

[22] "My office will take appropriate action to address this matter under applicable UNLV policies and procedures, which includes an investigation into the origins of the rumor, a determination of whether a violation of UNLV's policies and procedures occurred, and if so, appropriate disciplinary proceedings. These disciplinary proceedings, however, are a confidential student matter, the results of which cannot be shared with you." ECF No. 378 at 5.

[23] "Q. . . . So did Phillip Burns ever bring you into a formal situation to question you about Darren? [Chang]: I don't think so. I don't – I don't recall such thing. Q: Did Phillip Burns ever call you to his office to ask you about Kristin Malek? [Chang]: I don't remember such thing either." ECF No. 390-16 at 83-84.

[24] "Q: Did you review your notes of the investigation, regarding this case? [Burns]: There are no notes of the investigation of the case to review those notes were destroyed years ago. Q: Do you remember when? [Burns]: It would have been pretty much immediately after you left my office the last time we met in September of 2013. Q: And is that standard practice? [Burns]: It is for cases that are dismissed, yes. Q: Did you read your final report of the investigation regarding this case in preparation? [Burns]: There was no final report made." ECF No. 378 at 647.

[25] Heyman alleges that Burns said that he and Montgomery were not close. He submits Burns' deposition testimony, in which he admited that he has presented in her class on behalf of the office of student conduct (ECF No. 390-3 at 79-80), and Montgomery's interrogatory answers, in which she states that she has lunch with Burns once a year (ECF No. 390-22 at 13-14).

The defendants claim that they did not misrepresent or deceive Heyman in any way and that they conducted an adequate investigation into the rumor but found no wrongdoing. They rely on Burns' deposition testimony, in which he details his recollections of the investigation (ECF No 375-2 at 570-595), the individuals he allegedly interviewed (ECF No. 390-3 at 55), and how it is normal protocol for him to destroy notes from investigations that have been dismissed and to not write a final report if the investigation does not proceed past the initial stages (ECF No. *Id.* at 20).

*1. Fraud and Deceit Claims Arising from the Investigation (9-10, 12-13)*

Claims 9 and 13 against Burns and UNLV and Claims 10 and 12 against Snyder, Shoemaker, Burns, and UNLV all require that Heyman show by clear and convincing evidence that the defendants falsely represented a material fact. *See Long v. Towne*, 639 P.2d 528, 530 (Nev. 1982) (holding the plaintiffs' constructive fraud claim was properly dismissed because the defendants had not "misrepresented or concealed any material fact")*; Epperson v. Roloff*, 719 P.2d 799, 802 (Nev. 1986) (same for deceit or misrepresentation); *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 290, 89 P.3d 1009, 1018 (Nev. 2004) (same for fraud in the inducement); *Blanchard v. Blanchard*, 839 P.2d 1320, 1322 (Nev. 1992) (same for intentional misrepresentation ). "The mere failure to fulfill a promise or perform in the future . . . will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made." *Bulbman, Inc. v. Nevada Bell*, 825 P.2d 588, 592 (Nev. 1992).

Heyman offers no evidence to dispute that an investigation was performed or supervised by Snyder, Shoemaker, and Burns. Although the investigation may not have been as thorough or as expeditious as Heyman would have liked, Heyman does not offer sufficient evidence to show that these defendants made material misrepresentations to him in connection with the

investigation.  I therefore grant summary judgment in favor of Burns on Claims 9 and 13, in favor of Snyder, Shoemaker, and Burns on Claims 10 and 12, and in favor of UNLV on those claims that were based on the conduct of these defendants.

   *2. Contractual Claims Arising from the Investigation (6, 7, 8, and 11)*

   Heyman concedes that he has no contract with Snyder, Shoemaker, or Burns. ECF No. 389 at 18.  I therefore grant summary judgment in their favor on Claims 6, 7, 8, and 11.

   In regard to the contract claims against UNLV, Heyman submits that both the UNLV Code of the Hotel College and the UNLV Codes and Bylaws constitute contracts and that the actions of UNLV's agents breached those contracts. ECF No. 389 at 18.  The defendants argue that Heyman has presented no evidence that either of the codes constitutes a contract between him and UNLV.  They further argue that even if a contract exists, Heyman provides no evidence of a breach. ECF No. 394 at 6-8.  They posit that I should take a deferential view to UNLV's disciplinary procedures, consistent with previous decisions in this court. *See Lucey v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, No. 207-cv-00658-RLH-RJJ, 2009 WL 971667, at *6 (D. Nev. Apr. 9, 2009), *aff'd*, 380 F. App'x 608 (9th Cir. 2010) ("A court's review under a breach of contract theory for violations of a university's established disciplinary procedures is limited to whether the procedures used were arbitrary, capricious, or in bad faith.").

   Even if the codes are enforceable contracts, Heyman does not identify any specific language in them that the defendants' actions would plausibly have breached.  So, there is no genuine issue of fact concerning the contractual claims against UNLV, and UNLV is entitled to judgment as a matter of law.  I therefore grant summary judgment in favor of UNLV on Claims 6, 7, 8, and 11 as they relate to the investigation into the rumor.

*/ / / /*

*3. Negligence Claim Arising from the Investigation (Claim 16)*

"To prevail on a negligence theory, the plaintiff generally must show that (1) the defendant had a duty to exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was an actual cause of the plaintiff's injury; (4) the breach was the proximate cause of the injury; and (5) the plaintiff suffered damage." *Perez v. Las Vegas Med. Ctr.*, 805 P.2d 589, 591 (Nev. 1991). The Supreme Court of Nevada has "indicated [its] hesitance to affirm the granting of summary judgment in negligence cases, because such claims generally present jury issues." *Sims v. Gen. Tel. & Elecs.*, 815 P.2d 151, 154 (Nev. 1991) (overruled on other grounds) (quotation omitted). "[I]f the respondent can show that one of the elements is clearly lacking as a matter of law, however, then summary judgment is proper." *Id.*

As with the contractual claims discussed above, Heyman does not establish that any of the actions or inactions by Snyder, Burns, or UNLV constitutes a breach of their duty to exercise due care towards Heyman. The evidence shows that an investigation did occur. And although the investigation may not have been as thorough or as expeditious as Heyman would have liked, Heyman presents no evidence sufficient to create a genuine issue of fact as to whether a breach of duty occurred. I therefore grant summary judgment in favor of Snyder, Burns, and UNLV on Claim 16 as it relates to the investigation into the rumor.

**D.     Heyman's Claims Stemming from His Separation from UNLV (Claims 26-30)**

On March 25, 2015, Heyman was granted a leave of absence from his PhD program starting in Spring 2015 and ending in Fall 2015. ECF No. 390-26 at 2. On September 8, 2015, Heyman applied to extend his leave through Fall 2017 but was granted leave only through Fall 2016. *Id.* at 3. On March 10, 2016, UNLV sent a letter to Heyman informing him that he was being separated from his PhD program for "failure to return as scheduled or to secure an

extension of a prior leave of absence." ECF No. 390-4 at 2.  Heyman received this letter on March 17, contacted UNLV about the separation on March 18, and was reinstated to his program on March 21. ECF No. 375-4 at 23.

Heyman alleges that UNLV, through its agents working within their scope of employment, intentionally separated him from his PhD program as retribution for the present lawsuit or was negligent in allowing the separation to occur. ECF No. 377 at 15-16.  He claims that due to the five days between when he learned that he had been separated and was reinstated, he suffered damages in the form of emotional stress, which physically manifests through stomach cramps. ECF No. 390-14 at 2-3.  He sues UNLV for intentional infliction of emotional distress (Claim 26), negligence (Claim 27), breach of contract (Claim 28), contractual breach of the implied covenant of good faith and fair dealing (Claim 29), and tortious breach of the implied covenant of good faith and fair dealing (Claim 30).[26]
As evidence for these claims, Heyman offers the deposition testimony of Kara Wada, UNLV Director of Admissions and Records.  Ms. Wada testified that Heyman's separation should not have happened,[27] that mistaken separations such as Heyman's occur only about once per year,[28] and that it is protocol for the student's department to contact the student before a separation occurs to correct any mistakes or apply for a retroactive leave of absence,[29] which Heyman

---

[26] Heyman also sues a number of defendants for civil conspiracy relating to his separation (Claim 31).  I addressed this claim above.

[27] "Q: The fact that the separation letter was sent to [Heyman] in March of 2016 was a mistake?  [Wada]: Yes.  Q: Okay. It never should have happened?  [Wada]: Correct." ECF No. 390-24 at 66.

[28] "Q: From 2007 to 2016, you would say about ten people other than Darren [were mistakenly separated]?  [Wada]: That would be fair to say." *Id.* at 53.

[29] "Q: . . . So, it is the responsibility of the individual colleges to contact the students being separated, as far as you know?  [Wada]: It is the responsibility of the department to let us know if

alleges never occurred.  Heyman notes that Love was the Hotel College Graduate Coordinator at the time of the separation. ECF No. 377 at 7-8.

The defendants argue that Heyman's separation was a mistake due to a clerical error and that there is no evidence that Heyman was intentionally targeted as retribution for his lawsuit or that there was any coordinated effort to have him removed from his PhD program. ECF Nos. 374 at 5 and 12; 371 at 32-33.

*1. Intentional Infliction of Emotional Distress Arising from the Separation (Claim 26)*

To establish a claim for intentional infliction of emotional distress, the plaintiff must show "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999).  "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citations omitted). "Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Burns v. Mayer,* 175 F.Supp. 2d 1259, 1268 (D. Nev. 2001) (internal quotation omitted).

No reasonable jury could find that the actions Heyman relies on for this claim are "outside all possible bounds of decency and . . . utterly intolerable in a civilized community." *Maduike*, 953 P.2d at 26.  And he offers insufficient evidence of intentional or reckless disregard

---

the student should not be separated and contact the student about doing a leave of absence, if that's necessary." *Id.* at 57.

"Q: Again, [Heyman] should have been contacted to be given the opportunity to do a retroactive [leave of absence]?  [Wada]: Right." *Id.* at 68.

for causing emotional distress by any of the UNLV employees involved in his separation. He argues that mistaken separations are so uncommon that a reasonable jury could determine that UNLV intentionally separated him based on probability alone. I disagree. Heyman has failed to support his claim of intentional infliction of emotional distress, so I grant summary judgment in favor of UNLV on Claim 26.

### 2. Negligence Claim Arising from the Separation (Claim 27)

UNLV appears to move for summary judgment on Heyman's negligence claim but only through a brief reference to Claim 27. ECF No. 374 at 12. UNLV provides no substantive argument or legal or factual basis to support its motion on this claim other than to assert that the mistake was a clerical error. UNLV has not met its initial burden in moving for summary judgment, so I deny its motion as to Claim 27.

In his motion, Heyman argues that, as a public university, UNLV and its faculty have a duty to protect students, and that UNLV breached that duty both by mistakenly concluding that Heyman had not been approved for leave through Fall 2016 and by failing to notify him of his impending separation. He claims that due to the five days between when he learned that he had been separated and was reinstated, he suffered damages in the form of additional emotional stress, which physically manifests through stomach cramps. ECF No. 377 at 15-16.

Like UNLV, Heyman does not meet his initial burden in moving for summary judgement on Claim 27. Heyman nakedly asserts that each legal element of the claim has been met without providing any support for those assertions. He provides no authority for the proposition that a university and its employees have a duty to protect students from separations such as his. And courts in this district have previously rejected similar claims that a university owes a general duty of care to its students. *See Salus v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher*

*Educ.*, No. 2:10-cv-01734-GMN, 2011 WL 4828821, at *5 (D. Nev. Oct. 10, 2011); *Lucey*, 2007 WL 4563466, at *6. I therefore deny Heyman's motion for summary judgment on Claim 27.

Given that both parties have failed to adequately address the legal basis for Claim 27, I order Heyman and UNLV to provide supplemental motions for summary judgment regarding negligence, particularly as it applies to Heyman's temporary separation.

*3. Breach Claims Arising from the Separation (Claims 28, 29, 30)*

Neither UNLV nor Heyman's summary judgment briefings offers any relevant arguments about Heyman's claims for breach of contract (Claim 28) and breach of the implied covenant of good faith and fair dealing (Claims 29 and 30). *See* ECF No. 374 at 5 and 12; ECF No. 387 at 6 and 13; ECF No. 394 at 3 and 8-9; ECF No. 377 at 7-8; ECF No. 389 at 26-27; ECF No. 395 at 7. Thus, I deny both parties' motions for summary judgment on Claims 28-30. As with the negligence claim, I order Heyman and UNLV to provide supplemental motions regarding these claims arising from Heyman's separation. In that supplement, Heyman must identify the document or verbal statement he contends forms the contract he entered into with UNLV that gives rise to these claims. *See* ECF No. 28 at ¶ 1058.

**E.      Negligent Hiring, Training, Supervision, and Retention (Claim 17)**

Heyman claims that Snyder, Shoemaker, and UNLV were negligent in hiring, training, supervising, and retaining Montgomery, Burns, and Malek (Claim 17). He argues that but for the fact that each of these individuals was employed by UNLV, the rumor would never have started, the rumor would have been stopped immediately, or Heyman would have been publicly vindicated. ECF No. 28 at 82-86.

Most of Heyman's allegations in Claim 17 relate to material that Magistrate Judge Foley excluded. ECF No. 188 at 10-17. Heyman provides no evidence in support of the remaining

allegations, including the accusations that Montgomery was abusive and discriminatory to students, that Montgomery misappropriated University funds to buy alcohol, and that Malek had a reputation for spreading falsehoods at her previous university. And as I outlined above, Heyman presents no evidence that the defendants did not investigate the rumor. Heyman has not sustained his burden of defending against the defendants' motion on this claim. I therefore grant summary judgment in favor of Snyder, Shoemaker, and UNLV on Claim 17.

**IV. CONCLUSION**

IT IS THEREFORE ORDERED that the plaintiff's motion for summary judgment **(ECF No. 377) is DENIED**.

IT IS FURTHER ORDERED that Montgomery's motion for summary judgment **(ECF No. 371) is GRANTED**.

IT IS FURTHER ORDERED that the collective defendants' motion for summary judgement **(ECF No. 374) is GRANTED IN PART.** Claims 3-4, 6-8, 10-12, and 17 are dismissed as against all defendants; Claims 1-2, 5, 9, 13, and 16 are dismissed against Snyder, Shoemaker, Love, Tanford, Burns, and Moll-Cain; and Claim 26 is dismissed against UNLV. Heyman's only remaining claims are Claims 1-2, 5, 9, 13, and 16 against Malek and UNLV and Claims 27-30 against UNLV.

IT IS FURTHER ORDERED that Heyman and UNLV may submit supplemental motions for summary judgment on Claims 27-30 by **March 26, 2019**. Each side may submit a response by **April 9, 2019**. No replies shall be filed. Each motion and response is limited to 10 pages.

DATED this 12th day of March, 2019.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE